# U.S. District Court
## Eastern District of Virginia − (Alexandria)
## CRIMINAL DOCKET FOR CASE #: <u>1:18−mj−00501−TCB</u> All Defendants

Case title: USA v. Sours Edwards

Date Filed: 10/17/2018
Date Terminated: 10/18/2018

Assigned to: Magistrate Judge Theresa Carroll Buchanan

### Defendant (1)

**Natalie Mayflower Sours Edwards**
*TERMINATED: 10/18/2018*

represented by **Peter David Greenspun**
Greenspun Shapiro PC
3955 Chain Bridge Rd
Second Floor
Fairfax, VA 22030
(703) 352−0100
Fax: (703) 591−7268
Email: pdg@Greenspunlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

### Pending Counts

None

### Highest Offense Level (Opening)

None

### Terminated Counts

None

### Highest Offense Level (Terminated)

None

### Complaints

None

**Disposition**

**Disposition**

**Disposition**

### Plaintiff

**USA**

| Date Filed | # | Page | Docket Text |
|---|---|---|---|

| 10/17/2018 |   | 3 | Arrest of Natalie Mayflower Sours Edwards in Eastern District of Virginia. (tfitz, ) (Entered: 10/17/2018) |
| 10/17/2018 | 1 | 4 | Rule 40 Documents filed in Eastern District of Virginia as to Natalie Mayflower Sours Edwards. (Warrant not returned executed; filed in SDNY per USMS). (tfitz, ) (Entered: 10/17/2018) |
| 10/17/2018 | 2 | 22 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan:Initial Appearance in Rule 5(c)(3) Proceedings as to Natalie Mayflower Sours Edwards held on 10/17/2018. USA appeared through C. Grieco. Deft appeared w/counsel P. Greenspun. Deft informed of rights, charges and penalties. Deft waives Identity Hearing and requests Preliminary Hearing be held in charging District—GRANTED. USA does not seek detention at this time; Deft remanded to USMS to be released to her parents (3rd party custodians) on a $100,000 UNSECURED BOND w/conditions to appear in Southern District of New York for future proceedings (SEE BOND FOR DETAILS). (Tape #FTR.)(tfitz, ) (Entered: 10/17/2018) |
| 10/17/2018 | 3 | 23 | WAIVER of Identity Hearing by Natalie Mayflower Sours Edwards (tfitz, ) (Entered: 10/17/2018) |
| 10/17/2018 | 4 | 24 | ORDER Setting Conditions of Release on 3RD PARTY ($100,000 UNSECURED BOND) as to Natalie Mayflower Sours Edwards (1). Signed by Magistrate Judge Theresa Carroll Buchanan on 10/17/18. (tfitz, ) (Entered: 10/17/2018) |
| 10/17/2018 | 5 | 27 | Unsecured Bond Entered together with the order setting conditions of release as to Natalie Mayflower Sours Edwards in amount of $ $100,000.00. Defendant Released. (kbar, ) (Entered: 10/18/2018) |

```
MIME-Version:1.0
From:cmecf@vaed.uscourts.gov
To:Courtmail@localhost.localdomain
Bcc:
--Case Participants: Peter David Greenspun (pdg@greenspunlaw.com, vlg@greenspunlaw.com),
Magistrate Judge Theresa Carroll Buchanan (judge_buchanan@vaed.uscourts.gov,
tcb_chambers@vaed.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:8228301@vaed.uscourts.gov
Subject:Activity in Case 1:18-mj-00501-TCBVAED USA v. Sours Edwards Arrest - Rule 5
```
Content-Type: text/html

## U.S. District Court

### Eastern District of Virginia -

### Notice of Electronic Filing

The following transaction was entered on 10/17/2018 at 3:56 PM EDT and filed on 10/17/2018

| | |
|---|---|
| **Case Name:** | USA v. Sours Edwards |
| **Case Number:** | 1:18-mj-00501-TCB |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Arrest of Natalie Mayflower Sours Edwards in Eastern District of Virginia. (tfitz, )**

**1:18-mj-00501-TCB-1 Notice has been electronically mailed to:**

Peter David Greenspun &nbsp &nbsp pdg@Greenspunlaw.com, vlg@greenspunlaw.com

**1:18-mj-00501-TCB-1 Notice has been delivered by other means to:**

Approved: _Kimberly J. Ravener_____
KIMBERLY J. RAVENER/DANIEL C. RICHENTHAL
Assistant United States Attorneys

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

18 MAG 8861

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :      **COMPLAINT**

                                             Violations of
        - v. -                        :      31 U.S.C. § 5322,
                                             18 U.S.C. §§ 371 and 2

NATALIE MAYFLOWER SOURS EDWARDS, :
   a/k/a "Natalie Sours,"
   a/k/a "Natalie May Edwards,"       :
   a/k/a "May Edwards,"

                                      :

             Defendant.
                                      :

- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     EMILY P. ECKSTUT, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

COUNT ONE
(Unauthorized Disclosure of Suspicious Activity Reports)

     1.    From at least in or about October 2017, up to and
including in or about October 2018, NATALIE MAYFLOWER SOURS
EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards,"
a/k/a "May Edwards," the defendant, an employee of a federal
government authority, willfully violated subchapter II of Title
31 and a regulation and order prescribed thereunder, namely
Section 1023.320(e)(2) of Title 31 of the Code of Federal
Regulations, by disclosing Suspicious Activity Reports ("SARs"),
and information that would reveal the existence of a SAR, which
disclosure was not necessary to fulfill EDWARDS's official
duties, to wit, EDWARDS knowingly disclosed and described SARs,
which she obtained by virtue of her position as a Senior Advisor
at the United States Department of Treasury, Financial Crimes
Enforcement Network ("FinCEN"), including by electronically

sending images of such SARs to a member of the news media
("Reporter-1") via an encrypted application.

(Title 31, United States Code, Section 5322(a); Title 18, United
States Code, Section 2.)

### COUNT TWO
(Conspiracy to Make Unauthorized Disclosures
of Suspicious Activity Reports)

2.    From at least in or about October 2017, up to and
including in or about October 2018, NATALIE MAYFLOWER SOURS
EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards,"
a/k/a "May Edwards," the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with another to commit an
offense against the United States, to wit, to make unauthorized
disclosures of SARs and the existence of SARs, in violation of
Title 31, United States Code, Section 5322 and Title 31, Code of
Federal Regulations, Section 1020.320(e)(2).

3.    It was a part and an object of the conspiracy that
NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a
"Natalie May Edwards," a/k/a "May Edwards," the defendant, and
others known and unknown, would and did knowingly disclose and
describe SARs, which EDWARDS obtained by virtue of her position
as a Senior Advisor at FinCEN.

### OVERT ACTS

4.    In furtherance of the conspiracy and to effect the
illegal object thereof, the following overt acts, among others,
were committed and caused to be committed:

a. On or about August 2, 2018, NATALIE MAYFLOWER
SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May
Edwards," a/k/a "May Edwards," the defendant, exchanged
approximately 541 messages with Reporter-1 via a certain
encrypted application (the "Encrypted Application").

b. On various occasions between in or about October
2017 and in or about October 2018, EDWARDS transmitted files
containing or describing SARs to Reporter-1 via the Encrypted
Application.

2

c. Between on or about August 24, 2018 and October 2, 2018, a co-conspirator not named as a defendant herein ("CC-1") exchanged approximately 301 messages with Reporter-1 via the Encrypted Application.

d. On or about October 16, 2018, in an interview in the Eastern District of Virginia with federal law enforcement agents (the "Interviewing Agents"), EDWARDS initially concealed her relationship with Reporter-1 and denied having any contacts with the news media.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5.    I am a Special Agent with the FBI and have been so employed for approximately four years.  Within the FBI, I am assigned to a squad focused on public corruption crimes committed by government officials and others.

6.    I have been personally involved in the investigation of this matter.  This Affidavit is based upon my personal participation in the investigation, my review of law enforcement records, and my conversations with other law enforcement agents. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

*FinCEN, Suspicious Activity Reports, and Relevant Statutes*

7.    The mission of FinCEN is to "safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities."[1]   Among other things, FinCEN manages the collection and maintenance of suspicious activity reports (more commonly known as "SARs").  Under the Bank Secrecy Act of 1970 ("BSA"), United States financial institutions and other parties are required by law to generate SARs in order to report potentially suspicious financial transactions, and to deliver the SARs to FinCEN.  FinCEN in turn maintains a centralized

---

[1]    https://www.fincen.gov/about/mission.

database of the SAR data, which it makes available to law
enforcement pursuant to regulations and procedures that protect
the confidentiality of the information.

8.   Under the BSA and its implementing regulations,
disclosure of a SAR or its contents is unlawful.  Specifically,
31 C.F.R. § 1020.320(e) provides that "[a] SAR, and any
information that would reveal the existence of a SAR, are
confidential and shall not be disclosed except as authorized [by
law]."  Subsection 1020.320(e)(2) prohibits employees or agents
of government authorities from "disclos[ing] a SAR, or any
information that would reveal the existence of a SAR, except as
necessary to fulfill official duties consistent with Title II of
the Bank Secrecy Act."  Title 31, United States Code, Section
5322(a) imposes criminal penalties for willful violations of the
BSA and its implementing regulations, including the disclosure
of a SAR.

### *Unauthorized SAR Disclosures*

9.   Together, the FBI and the United States Department of
Treasury—Office of Inspector General ("Treasury-OIG") have been
investigating a series of unauthorized disclosures of SARs and
SAR information occurring between in or about October 2017 and
continuing into at least mid-October 2018.

10.  From my participation in the investigation and my
conversations with other law enforcement agents involved in the
investigation, I have learned the following, in substance and in
part:

a. Treasury-OIG agents have identified a pattern of
unauthorized disclosures of SAR information appearing in the media
starting in or about October 2017 and continuing until in or about
the present (collectively, the "SARs Disclosures").  Each of the
SARs Disclosures related to matters relevant to investigations
being conducted by the Office of the Special Counsel, the United
States Attorney's Office for the Southern District of New York,
and/or the National Security Division of the United States
Department of Justice, such as suspicious transactions relating to
Paul Manafort, Richard W. Gates, Russian diplomatic accounts, and
other matters.

b. The SARs Disclosures included the following:

i.    Between October 2017 and March 2018, a news
organization (the "News Organization"), headquartered in New York,

New York, published approximately twelve news articles containing detailed information that appeared to track the contents of SARs protected by the BSA (collectively, the "SARs Disclosure Articles").

       ii.      The articles were published on or about October 29, 2017 (the "October 2017 Article"); November 14, 2017 (the "November 2017 Article"); January 17, 2018 (the "January 2018 Article"); February 19, 2018 (the "February 2018 Article"); and March 16, 2018 (the "March 2018 Article"); July 31, 2018 (the "July 2018 Article"); August 10, 2018 (the "First August 2018 Article"); August 29, 2018 (the "Second August 2018 Article"); September 12, 2018 (the "First September 2018 Article"); September 21, 2018 (the "September 21, 2018 Article"); and October 15, 2018 (the "October 2018 Article").  Reporter-1 was listed as an author (though not always the only author) of all of the SARs Disclosure Articles.

       iii.     The October 2017 Article claimed that the News Organization "has learned specific details about 13 [] wire transfers" related to Paul Manafort "all of which took place between 2012 and 2013," and described that "[t]he transfers were first flagged by US financial institutions, which are required by law to tell an office within the Treasury Department about any transactions they deem suspicious" in the form of "suspicious activity reports."

       iv.     The November 2017 Article was entitled "Secret Finding: 60 Russian Payments To Finance Election Campaign Of 2016," and also referenced "suspicious activity reports" and their findings.

       v.     Similarly, the January 2018 Article referred to detailed financial "[r]ecords reviewed exclusively by [the News Organization]" related to financial transactions involving the Russian Embassy, stating that "[t]he Treasury Department turned over the suspicious activity reports to the FBI" after "[e]ach of these transactions sparked a 'suspicious activity report' sent to the US Treasury's financial crimes unit [that is, FinCEN] by Citibank, which handles accounts of the Russian Embassy," and citing to a "US official with knowledge of the inquiry."

       vi.     The February 2018 Article and March 2018 Article likewise specifically referenced "suspicious activity reports" associated with Paul Manafort in detail, and the March 2018 article specifically discussed actions taken by FinCEN with respect to the reports.

vii.    The July 2018 Article was entitled "Russian 'Agent' And a GOP Operator Left a Trail of Cash, Documents Reveal." The July 2018 Article described in extensive detail a series of financial transactions derived from bank records allegedly involving a political consultant and Mariia Butina, who was indicted on or about July 17, 2018 in the United States District Court for the District of Columbia for acting as an unregistered foreign agent and conspiracy to commit the same.  The July 2018 Article described "suspicious transactions cited by the bank and federal investigators," "none of which have been made public." Based upon my training, experience, and my conversations with other law enforcement agents involved in the investigation, I believe that these references indicate that the data in the July 2018 Article was obtained from SARs.

viii.    The First August 2018 Article was entitled "GOP Operative Made 'Suspicious' Cash Withdrawals During Pursuit of Clinton Emails."  The First August 2018 Article discussed specific financial transactions made by an individual who purportedly launched an independent effort in 2016 to obtain emails belonging to Hillary Clinton from Russian hackers.  For example, the First August 2018 Article claimed that "[a]fter scouring nine accounts that [the individual] controlled, Northern Trust turned over documents showing 88 suspicious cash withdrawals totaling about $140,000 between January 2016 and April 2017, including a $3,000 withdrawal six days after the election" and noted that "the bank sent a report to Treasury's financial crimes unit, which shared its findings with the FBI, special counsel Robert Mueller, and Senate Intelligence Committee investigators."  Based upon my training, experience, and my conversations with other law enforcement agents involved in the investigation, I believe that the data in the First August 2018 Article was obtained from SARs.

ix.    The Second August 2018 Article was entitled "Here's Why the FBI and Mueller Are Investigating 'Suspicious' Transactions by Russian Diplomats."  The article, which discussed suspicious transactions by, among others, a previous Russian ambassador to the United States, noted that "Citibank sent information that it compiled about [the ambassador's] and the [Russian] embassy's accounts to the US Treasury Department's financial crimes unit [that is, FinCEN] and the FBI in early 2017," and discussed the details of two specific financial transactions – one approximately 10 days after the U.S. presidential election, and another five days after the U.S. presidential inauguration. The article cited "three federal law enforcement sources with direct knowledge of the matter" as its sources.  Based upon my training, experience, and my conversations with other law

6

enforcement agents involved in the investigation, I believe that these references indicate that the data in the Second August 2018 Article was obtained from SARs.

x.     The First September 2018 Article was entitled "A Series of Suspicious Money Transfers Followed the Trump Tower Meeting." The article discussed "secret documents reviewed by [the News Organization]," and specifically referenced "two bursts of transactions that bank examiners deemed suspicious" involving a wealthy Russian family—one of whom had allegedly arranged a meeting at Trump Tower between a Russian national and representatives of the Trump campaign during the 2016 presidential campaign (the "Trump Tower Meeting")—and their business associates in the aftermath of the Trump Tower Meeting. The article revealed the dates, amounts, and parties involved in the transactions in extensive detail, specifically stating that the transactions were identified after "bankers filed 'suspicious activity reports' to the Treasury Department's Financial Crimes Enforcement Network [that is, FinCEN], which in turn shared them with the FBI, the IRS, congressional committees investigating Russian interference, and members of special counsel Robert Mueller's team." The article cited "four federal law enforcement officials" as its sources. Based upon my training, experience, and my conversations with other law enforcement agents involved in the investigation, I believe that these references indicate that the data in the First September 2018 Article was obtained from SARs.

xi.     The September 21, 2018 Article was entitled "The Planners Of The Trump Tower Meeting Moved Millions, And Mueller Is Now Investigating." Referring to "[d]ocuments reviewed by [the News Organization]," the September 21, 2018 Article described "suspicious transactions" of approximately $3.3 million relating to "a billionaire real estate developer close to both Vladimir Putin and President Donald Trump," among others, occurring in or around June 2016, close in time to the Trump Tower Meeting. The September 21, 2018 Article specifically noted "[t]he details unearthed by bankers were compiled in "suspicious activity reports" sent to the Treasury Department's Financial Crimes Enforcement Network [that is, FinCEN], which shared them with other law enforcement agencies investigating Russian interference." Based upon my training, experience, and my conversations with other law enforcement agents involved in the investigation, I believe that these references indicate that the data in the September 21, 2018 Article was obtained from SARs.

xii.     The October 2018 Article was entitled "Here's How a Major Western Bank Enabled A Suspected Russian Money

7

Launderer." The October 2018 Article related to Prevezon Alexander
("Prevezon"), an entity charged in a previous civil forfeiture
case in the Southern District of New York relating to an alleged
Russian money laundering scheme in which an investment company
(the "Investment Company") was among the victims, among other
things.  The October 2018 Article discussed a loan made by a
particular banking institution to a Prevezon subsidiary, and noted
that "[t]he records of this transaction, which have never been
publicly reported, were unearthed by the US Treasury Department's
financial crimes unit [that is, FinCEN] during investigations by
Congress and special counsel Robert Mueller, both of whom are
digging into Russia's interference in the 2016 election."  Based
upon my training, experience, and my conversations with other law
enforcement agents involved in the investigation, I believe that
these references indicate that the data in the October 2018 Article
was obtained from SARs.

11.  Based upon my conversations with other law enforcement
agents who have reviewed the SARs Disclosure Articles described
above, I have learned that several of the SARs Disclosure
Articles described various transactions occurring in or through
New York, New York, and refer to reports made by financial
institutions with offices in New York, New York.

### Overview of EDWARDs' Access to and Unlawful Disclosure of SARs

12.  As described in more detail below, there is probable
cause to believe that NATALIE MAYFLOWER SOURS EDWARDS, a/k/a
"Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May
Edwards," the defendant, without authorization, provided some or
all of the SARs Disclosures to Reporter-1 for publication, and
was aware that a purpose of at least certain of such SARs
Disclosures was for publication by the News Organization.
Specifically, for the reasons set forth below, I believe that:

a.  EDWARDS began communicating with Reporter-1 in or
about July 2017.

b.  EDWARDS had access to all of the SARs implicated
by the SARs Disclosures.  Between in or about October 2017 — the
month when the SARs Disclosures began — and January 2018,
EDWARDS saved thousands of FinCEN files, including all of the
SARs implicated by the SARs Disclosures, to a flash drive
provided to her by FinCEN.

c.  Throughout the course of 2018, EDWARDS engaged in
hundreds of electronic communications with Reporter-1, many via

an encrypted application.  A review to date, pursuant to a
judicially-authorized search warrant executed today, of
EDWARDS's personal cellphone has revealed that that cellphone
contains the substance of many of these communications,
including, as described in greater detail below, communications
in which EDWARDS transmitted or described SARs or other BSA-
protected information to Reporter-1.

        d.   When questioned by law enforcement officials
earlier today, EDWARDS confessed that she had provided SARs to
Reporter-1 via an encrypted application, though falsely denied
knowing that Reporter-1 intended to or did publish that
information through the News Organization.  At the time she was
questioned, EDWARDS was also in possession of a flash drive that
appeared to be the same drive on which she saved the SARs
related to the SARs Disclosures, among other files.

                    *EDWARDS's Access to SARs*

        13.  Based on my conversations with other law enforcement
agents who have reviewed emails obtained from a government email
address assigned to NATALIE MAYFLOWER SOURS EDWARDS, a/k/a
"Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May
Edwards," the defendant (the "EDWARDS Work Account") and
electronic files maintained by FinCEN, I have learned that
EDWARDS has access to certain electronic folders maintained on
FinCEN's network that contain many, if not all, of the SARs at
issue in the SARs Disclosures.

        14.  Based upon my conversations with other law enforcement
agents who have consulted with Treasury analysts who conducted a
forensic review of government computer usage by NATALIE
MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie
May Edwards," a/k/a "May Edwards," the defendant, and certain
records from Treasury's networks, and Treasury staff regarding
the electronic equipment issued by FinCEN to EDWARDS, I have
learned the following, among other things:

        a.   Prior to in or about January 2017, at least one
government-issued external flash drive (the "Flash Drive") was
provided to EDWARDS for work purposes.

        b.   Through forensic analysis to date, FinCEN has been
able to identify records reflecting that more than 24,000 files
were saved to the Flash Drive between approximately January 2017
and approximately January 2018 (the "Flash Drive Files").  The
majority of the files were saved to a folder on the Flash Drive

entitled "Debacle – Operation-CF," and subfolders bearing names
such as "Debacle\Emails\Asshat." EDWARDS is not known to be
involved in any official FinCEN project or task bearing these file
titles or code names.

      c.   Based upon my conversations with other law
enforcement agents who have spoken with FinCEN analysts, who have
in turn, reviewed the names of the Flash Drive Files, and conducted
a comparison of those file names/sizes to records contained on
FinCEN's network, the Flash Drive Files appear to contain thousands
of SARs, along with other highly sensitive material relating to
Russia, Iran, and the terrorist group known as the Islamic State
of Iraq and the Levant (more commonly known as "ISIL" or "ISIS"),
among other things. Multiple files also bear labels referencing
Paul Manafort and Reporter-1's name.

      d.   Based upon the same, it appears that the Flash Drive
Files include all of the SARs implicated by the SAR Disclosures
published by the News Organization. Available data indicates that
these SARs were first saved to the Flash Drive by at least on or
about October 18, 2017 – approximately 11 days prior to the
publication of the first SAR Disclosure, that is, the October 2017
Article. Additional files relating to SARs were saved to the Flash
Drive again on or about January 8, 2018.

    15.   Through my conversations with other law enforcement
agents who have spoken with FinCEN staff, I have been informed
that there is no known legitimate business purpose for NATALIE
MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie
May Edwards," a/k/a "May Edwards," the defendant, to save the
large quantity of Flash Drive Files, and particularly, the SARs
related to the SARs Disclosures, to the Flash Drive.

### EDWARDS's Communications with Reporter-1

    16.   Based on my conversations with other law enforcement
agents who have reviewed emails obtained pursuant to a
judicially-authorized search warrant on a web-based personal
email account believed to be used by NATALIE MAYFLOWER SOURS
EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards,"
a/k/a "May Edwards," the defendant (the "EDWARDS Personal

USCA4  13

Account"),[2] I have learned that Reporter-1 first contacted EDWARDS in or about July 2017 seeking information regarding an issue that did not implicate the SARs Disclosures.

17.    Based upon my conversations with other law enforcement agents who have reviewed phone records for a personal cellphone subscribed to by NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant (respectively, the "EDWARDS Phone Records" and the "EDWARDS Cellphone"), I have learned, in part, that:

a. On or about February 14, 2018, approximately five days prior to the publication of the February 2018 Article, the EDWARDS Phone sent approximately four text messages to a cellphone associated with Reporter-1 (the "Reporter-1 Cellphone").

b. On or about July 27, 2018, days before the publication of the July 2018 Article, the EDWARDS Cellphone placed a phone call to the Reporter-1 Cellphone, beginning at approximately 3:43 p.m. and lasting approximately 15 minutes.

c. On or about August 2, 2018, approximately two days after the publication of the July 2018 Article and approximately one week before the publication of the First August 2018 Article, the EDWARDS Cellphone placed a phone call to the Reporter-1 Cellphone, beginning at approximately 9:08 p.m. and lasting more than 23 minutes.

d. On or about August 3, 2018—approximately seven days before the publication of the First August 2018 Article—several short calls, each lasting less than one minute, were exchanged between the EDWARDS Cellphone and the Reporter-1 Cellphone, beginning at approximately 9:54 a.m. At approximately 10:11 a.m., the EDWARDS Cellphone received a phone call lasting more than five minutes from the Reporter-1 Cellphone.

e. On or about August 17, 2018, approximately one week after the publication of the First August 2018 Article and approximately 12 days before the publication of the Second August 2018 Article (discussed further below), the EDWARDS Cellphone

---

[2]    Among other things, subscriber information relating to the EDWARDS Personal Account identifies the subscriber as "May E," and search warrant results have revealed that the user of the EDWARDS Personal Account routinely introduces herself as "Dr. May Edwards," and describes herself as a FinCEN employee with a professional background matching that of EDWARDS.

placed a phone call to the Reporter-1 Cellphone, which began at approximately 11:43 p.m. and lasted nearly 40 minutes.

      f. On or about September 7, 2018, approximately five days prior to the publication of the First September 2018 Article, the EDWARDS Cellphone placed a phone call to the Reporter-1 Cellphone, which began at approximately 1:25 p.m. and lasted for nearly three minutes.

    18.  Based upon my training, experience, my conversations with other law enforcement agents with training and experience in cyber technology, and my conversations with law enforcement agents who have reviewed records received in response to a judicially-authorized pen register and trap and trace order for the EDWARDS Cellphone (the "EDWARDS Pen"), I have learned, among other things, that:

      a. The EDWARDS Cellphone utilized a mobile messaging service that utilizes end-to-end encryption (the "Encrypted Application"), that is, a method of secure communication that prevents third-parties from accessing data, including the companies that host the end-to-end encrypted services, and law enforcement.

      b. On or about August 1, 2018, within approximately six hours of the EDWARDS Pen becoming operative—and the day after the July 2018 Article was published—the EDWARDS Cellphone exchanged approximately 70 messages via the Encrypted Application with the Reporter-1 Cellphone during an approximately 20-minute time span between 12:33 a.m. and 12:54 a.m.

      c. Between on or about July 31, 2018 and August 2, 2018, the EDWARDS Cellphone and the personal cellphone of CC-1 exchanged dozens of messages via the Encrypted Application.

      d. On or about August 2, 2018, approximately one week prior to the publication of the First August 2018 Article, the EDWARDS Cellphone exchanged approximately 541 messages with the Reporter-1 Cellphone via the Encrypted Application.

      e. On or about August 10, 2018, the day of the publication of the First August 2018 Article, the EDWARDS Cellphone and the Reporter-1 Cellphone exchanged approximately 11 messages via the Encrypted Application.

USCA4 15

f. On or about August 15, 2018, the EDWARDS Cellphone exchanged approximately 14 messages with the Reporter-1 Cellphone via the Encrypted Application.

### CC-1's Communications with Reporter-1

19.   Based on my participation in the investigation and my conversations with other law enforcement agents who have reviewed documents obtained in the investigation to date, I have learned that CC-1 is an Associate Director of FinCEN to whom NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant, reports.

20.   Based on my conversations with other law enforcement agents who have reviewed phone records for a cellphone documented in FinCEN records as the personal cellphone number for CC-1 (the "CC-1 Cellphone"), I have learned that in or about October 2017 — i.e., the month of the October 2017 Article containing SARs Disclosures – the CC-1 Cellphone exchanged approximately 325 text messages with the Reporter-1 Cellphone.

21.   Based upon my conversations with other law enforcement agents who have reviewed records to date in response to a judicially-authorized pen register and trap and trace order for the CC-1 Cellphone, I have learned, in part, that:

a. On or about August 15, 2018, the CC-1 Cellphone exchanged approximately 10 messages with the Reporter-1 Cellphone via the Encrypted Application.

b. Between on or about August 24, 2018 and October 2, 2018, the CC-1 Cellphone exchanged approximately 301 messages with the Reporter-1 Cellphone via the Encrypted Application.

### The Interview and Search of EDWARDS

22.   Based upon my conversations with the Interviewing Agents, I have learned that today, after the Interviewing Agents identified themselves, and stated, in sum, that they wished to speak with NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant, the following conversation took place, in substance and in part:

13

      a.    Initially, EDWARDS denied having any contact with any member the news media, but indicated that she was aware that CC-1 and another FinCEN employee ("Employee-1") were in contact with the news media.

      b.    Upon direct questioning regarding Reporter-1, EDWARDS changed her account, and admitted that, on numerous occasions, she accessed SARs on her computer, photographed them, and sent those photographs to Reporter-1 using the Encrypted Application.

      c.    EDWARDS further admitted to meeting Reporter-1 in person on at least two occasions.

      d.    EDWARDS claimed not to have read the SARs Disclosure Articles published by Reporter-1, and claimed no knowledge that the SAR information she disclosed to Reporter-1 was published.  As set forth below, information relating to EDWARDS's Internet usage demonstrates that this statement is false.[3]

23.  Based upon my conversations with the Interviewing Agents, I have further learned that, in connection with the above-described interview and pursuant to a judicially-authorized search warrant, law enforcement agents conducted a search of NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant, and recovered an electronic storage media item believed to be the Flash Drive as well as at least one cellphone, believed to the EDWARDS Cellphone.

24.  Based upon my conversations with other law enforcement agents who have reviewed to date results from the judicially-authorized search of the cellphone seized today from NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," the defendant, I have learned the following, among other things:

---

[3]    During the interview described herein, EDWARDS told the Interviewing Agents, in sum and substance, that she is a "whistleblower" who provided the SARs to Reporter-1 for "record keeping."  Based on my participation in this investigation and my conversations with other law enforcement agents, I am aware that, prior to the SARs Disclosures, EDWARDS had previously filed a whistleblower complaint unrelated to the SARs Disclosures, and that EDWARDS had also reached out to congressional staffers regarding, among other things, her unrelated whistleblower complaint.

14

a. On various occasions between in or about October 2017, up to and including in or about October 2018, EDWARDS transmitted the following items and information, among others, via the Encrypted Application, to Reporter-1:

i.   SARs, including but not limited to SARs related to the SARs Disclosures published by the News Organization;

ii.   Files and spreadsheets reflecting SAR data, including data relating to the existence of SARs;

iii. The results of searches by EDWARDS for whether SARs had been filed with respect to certain people or entities, in which Reporter-1 appeared interested;

iv.   FinCEN internal emails appearing to relate to SARs or other information protected by the BSA; and

v.   FinCEN non-public memoranda, including Investigative Memos and Intelligence Assessments published by the FinCEN Intelligence Division, which contained confidential personal, business, and/or security threat assessments, including those marked "Law Enforcement Sensitive" and that contained BSA-protected information.

b. For example, in one exchange, EDWARDS appeared to send Reporter-1 a series of approximately five spreadsheet files, all containing SAR identifying numbers in the file titles.   EDWARDS then appeared to send a 465-page file labeled "Paul Manafort [] request from Senate Select Committee on Intelligence.pdf" (the "Manafort File").   As sent by EDWARDS, the Manafort File appeared to display an image of an actual SAR on the face of the message to Reporter-1.

c. As noted above, the October 2018 Article regarded, among other things, Prevezon and the Investment Company.   As recently as September 2018, EDWARDS and Reporter-1 engaged in the following conversation, via the Encrypted Application, in relevant part:

15

EDWARDS:        I am not getting any hits on [the CEO
of the Investment Company]
do you have any idea what the
association is
if I had more information i could
search in different areas
. . .

Reporter-1:    If not on his name it would be [the
Investment Company]. That's the only
other one
[The CEO] is associated with Prevezon
Well not associated
. . .
His company is [the Investment Company]

. . .

d. Based upon my training and experience, my participation in the investigation, and my conversations with other law enforcement agents familiar with the investigation, I believe that in the above conversation, EDWARDS was explaining that she had performed searches of FinCEN records relating to Prevezon, at Reporter-1's request, in order to supply SAR information for the October 2018 Article.

e. In addition, in multiple communications, EDWARDS and Reporter-1 referenced CC-1, and Reporter-1 expressed that Reporter-1 was also in contact with CC-1.

25. Subsequent to the interview and search described above, NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant, was placed under arrest.

### EDWARDS's Personal Email Account

26. Based on my conversations with other law enforcement agents who have reviewed to date the contents and other information of the EDWARDS Personal Account, the data described above, and publicly-available information, I have learned that:

16

a. On or about August 3, 2018, NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a "Natalie May Edwards," a/k/a "May Edwards," the defendant, sent an email from the EDWARDS Personal Account to another web-based email account bearing the name of Reporter-1, stating in the Subject line: "Can you add," followed by, in the text of the email, "The others if there are others to this file . . ." The email attached a document listing the titles and Internet links for the October 2017 Article, the November 2017 Article, and the January 2018 Article, among other things.

b. Internet search history records relating to the EDWARDS Personal Account reflect, among other things, that:

i.   On or about October 30, 2017, approximately one day after the October 2017 Article was published, the user of the EDWARDS Personal Account ran an Internet search for "these 13 wire transfers are a focus of the fbi probe into paul," and seconds later, visited the News Organization website to view the October 2017 Article.  The title of the October 2017 Article was "These 13 Wire Transfers Are A Focus of the FBI Probe Into Paul Manafort."

ii.   On or about February 20, 2018, approximately one day after the February 2018 Article was published, the user of the EDWARDS Personal Account ran an Internet search for "manafort under scrutiny," and seconds later, visited the News Organization website to view the February 2018 Article.  The February 2018 Article was entitled "Manafort Under Scrutiny for $40 Million in 'Suspicious Transactions.'"

iii. On or about August 31, 2018, approximately two days after the publication of the Second August 2018 Article, the user of the EDWARDS Personal Account ran an Internet search for "[Reporter-1] articles."

17

WHEREFORE, deponent prays that an arrest warrant for
NATALIE MAYFLOWER SOURS EDWARDS, a/k/a "Natalie Sours," a/k/a
"Natalie May Edwards," a/k/a "May Edwards," the defendant, be
issued and that EDWARDS be arrested and imprisoned, or bailed,
as the case may be.

EMILY P. ECKSTUT
Special Agent
Federal Bureau of Investigation

Sworn to before me this
16th day of October, 2018

HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE,
SOUTHERN DISTRICT OF NEW YORK

pursuant to Fed R. Crim P. 4.1

18

# UNITED STATES DISTRICT COUR
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

**MAGISTRATE JUDGE: THERESA CARRROLL BUCHANAN**

UNITED STATES OF AMERICA                HEARING:  R5/R40          CASE #:   1:18MJ501

      -VS-                                 DATE:  10/17/18          TIME:  2:00 pm

                                                 TYPE: FTR RECORDER    DEPUTY CLERK: T. FITZGERALD
_____ Natalie Sours Edwards _____

COUNSEL FOR THE UNITED STATES:_____ C. Grieco _____

COUNSEL FOR THE DEFENDANT:_____ P. Greenspun _____

INTERPRETER:_____LANGUAGE:_____

( **x** ) **DEFENDANT APPEARED:**  ( **x** ) **WITH COUNSEL**  ( ) WITHOUT COUNSEL

( **x** ) **DEFT. INFORMED OF RIGHTS, CHARGES, PENALTIES and/or VIOLATIONS**

( ) COURT TO APPOINT COUNSEL _____  ( **x** ) **DFT. HAS RETAINED COUNSEL**

( ) GVT. CALL WITNESS & ADDUCES EVIDENCE

( ) EXHBIT #_____ADMITTED

( ) PROBABLE CAUSE: FOUND ( ) / NOT FOUND ( )

( ) PRELIMINARY HEARING WAIVED

( ) MATTER CONTINUED FOR FURTHER PROCEEDINGS BEFORE THE GRAND JURY

( ) DEFT. ADMITS VIOLATION ( )DFT. DENIES VIOLATION ( )COURT FINDS DFT. IN VIOLATION

**MINUTES:** USA does NOT seek detention at this time; Deft released on BOND w/specified conditions which include Deft to appear in Southern District of New York for Preliminary Hearing within the time period specified (SEE BOND).

**CONDITIONS OF RELEASE:**
**( $100,000 ) UNSECURED ($** ) SECURED **( x ) PTS (  x  ) 3RD PARTY (  x  ) TRAVEL RESTRICTED**
( ) APPROVED RESIDENCE **( x ) SATT** ( ) PAY COSTS ( ) ELECTRONIC MONITORING ( ) MENTAL HEALTH
TEST/TREAT ( ) ROL ( ) NOT DRIVE ( ) FIREARM **( x ) PASSPORT ( x ) AVOID CONTACT**
**( x ) DRUG USE** ( ) EMPLOYMENT

( **x** ) **DEFENDANT REMANDED TO THE CUSTODY OF THE U.S. MARSHALS to be released on BOND w/conditions.**
( ) DEFENDANT CONTINUED ON SAME CONDITIONS OF PROBATION

**NEXT COURT APPEARANCE:_____ at _____ Before_____**
( ) DH ( ) PH ( ) STATUS ( ) TRIAL ( ) JURY ( ) PLEA ( ) SENT ( ) PBV ( ) SRV ( ) R5

AO 466A (Rev. 07/16) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

OCT 1 7 2018

CLERK, U.S. COURT

| United States of America | ) | |
| v. | ) | Case No. 1:18mJ501 |
| | ) | |
| Natalie Edwards | ) | Charging District's Case No. 18 MAG 8861 |
| *Defendant* | ) | |

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the *(name of other court)* Southern District of New York

I have been informed of the charges and of my rights to:

(1)  retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)  an identity hearing to determine whether I am the person named in the charges;

(3)  production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)  a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5)  a hearing on any motion by the government for detention;

(6)  request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☐  an identity hearing and production of the warrant.

☐  a preliminary hearing.

☐  a detention hearing.

☐  an identity hearing, production of the warrant, and any preliminary or detention hearing to which I may be entitled in this district. I request that any preliminary or detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: 10/17/18

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

PRETON D. CUNNINGHAM
*Printed name of defendant's attorney*

USCA4 23

AO 199A (Rev. 6/97) Order Setting Conditions of Release                                                    Page 1 of ___ Pages

# UNITED STATES DISTRICT COURT

**Eastern**          **District of**          **Virginia**

United States of America

### ORDER SETTING CONDITIONS
### OF RELEASE

V.

Natalie Edwards

Case Number: **1:18mJ501**

Defendant

IT IS ORDERED that the release of the defendant is subject to the following conditions:

(1) The defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

(2) The defendant shall immediately advise the court, defense counsel and the U.S. Attorney in writing before any change in address and telephone number.

(3) The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as

directed. The defendant shall appear at (if blank, to be notified) _____          United States District Court
For Southern District of New York
~~101 Courthouse Sq., Alexandria, VA~~          on ___          TBD and/or on or before
                                                                 Date and Time          11/21/18 .

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released provided that:

( ✓ ) (4) The defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.
and her parents
( ✓ ) (5) The defendant executes an unsecured bond binding the defendant to pay the United States the sum of

One Thousand dollars _____          dollars ($100,000          )

in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL   SERVICES   U.S. ATTORNEY   U.S. MARSHAL

Case 1:18-mj-08861-UA   Document 3   Filed 10/22/18   Page 25 of 30
Case 1:18-mj-00501-TCB   Document 4   Filed 10/17/18   Page 2 of 3   PageID 22

Page 2 of 3 Pages

AO 199B (Rev. 12/11) Additional Conditions of Release

## ADDITIONAL CONDITIONS OF RELEASE

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

(☒) (6) The defendant is placed in the custody of:
Person or organization **her parents Archie W. Sours + Martha Sours**
Address (only if above is an organization)
City and state _____ Tel. No. _____
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: **Martha A Sours** _____ **17 Oct 2018**
_____ Custodian _____ **17 Oct 2018**
_____ Date

(☒) (7) The defendant must:
(☒) (a) report on a regular basis to the following agency: **Pretrial Services**
(☐) (b) continue or actively seek employment.
(☐) (c) continue or start an education program.
(☒) (d) surrender any passport to: **Pretrial Services per husband's passport**
(☒) (e) not obtain a passport or other international travel document. **SDNY, DC**
(☒) (f) abide by the following restrictions on personal association, residence, or travel: **Do not depart the ~~Washington D.C.~~, EDVA metropolitan area** without prior approval of Pretrial Services or the Court.
(☒) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: **CC 1, Reporter 1, FinCEN personnel (except in presence of counsel)**
(☐) (h) get medical or psychiatric treatment: _____

(☐) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling,
or the following purposes: _____

(☐) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.
(☐) (k) not possess a firearm, destructive device, or other weapon.
(☐) (l) not use alcohol ( ☐ ) at all ( ☐ ) excessively.
(☒) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
(☒) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.
(☐) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.
(☐) (p) participate in one of the following location restriction programs and comply with its requirements as directed.
(☐) (i) **Curfew.** You are restricted to your residence every day ( ☐ ) from _____ to _____ , or ( ☐ ) as directed by the pretrial services office or supervising officer; or
(☐) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
(☐) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.
(☐) (q) submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.
(☐) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or supervising officer.
(☒) (r) report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.
(☒) (s) **No access to FinCEN property or equipment without express permission of FinCEN Director or his designee. Preliminary hearing to be set at least 30 days from now with consent of court in SDNY.**

Case 1:18-mj-08861-UA   Document 3   Filed 10/22/18   Page 26 of 30
Case 1:18-mj-00501-TCB   Document 4   Filed 10/17/18   Page 3 of 3   PageID 23
AO 199C (Rev. 09/08) Advice of Penalties                                    Page_____ of _____ Pages

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:
(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;
(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
*Defendant's Signature*

NEW KENT  VA              804 651 3040
*City and State*          *Telephone Number*

### Directions to the United States Marshal

( ☒ ) The defendant is ORDERED released after processing.
( ☐ ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: ___10/17/18___

_____
*Judicial Officer's Signature*
/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Printed name and title*

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL SERVICE   U.S. ATTORNEY   U.S. MARSHAL

AO 98 (Rev. 8/85) Appearance Bond

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

V.                                                    **APPEARANCE BOND**

Natalie Edwards                                       CASE number: 1:18mj501

Surety: We, the undersigned, jointly and severally acknowledge that we and our...
personal representatives, jointly and severally, are bound to pay the United States of America the sum of
$1000,000.00 UNSECURED.

The conditions of this bond are that the defendant Natalie Edwards is to appear before
this court and at such other places as the defendant may be required to appear, in accordance with any and
all orders and directions relating to the defendant's appearance in this case, including appearance for
violation of a condition of defendant's release as may be ordered or notified by this court or any other
United States district court to which the defendant may be held to answer or the cause transferred. The
defendant is to abide by any judgment entered in such a matter by surrendering to serve any sentence
imposed and obeying any order or direction in connection with such judgment.

It is agreed and understood that this is a continuing bond (including any proceeding on
appeal or review) which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the
foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or
perform any of these conditions, payment of the amount of the bond shall be due forthwith. Forfeiture of
this bond for any breach of its conditions may be declared by any United States district court having
cognizance of the above entitled matter at the time of such breach and if the bond is forfeited and if the
forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States district
court against each debtor jointly and severally for the amount above stated, together with interests and
costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal
Procedure and any other laws of the United States.

This bond is signed on 10/17/2018 at 401 Courthouse Square, Alexandria, VA22314

Defendant: _____          Address: _____
            Natalie Edwards
Surety: _____              Address: _____
            Archie Sours
Surety: _____              Address: _____
            Martha Sours

Signed and acknowledged before me on 10/17/2018          Fernando Galindo
                                                         Clerk of Court
                                                         BY: _____
Approved: _____                             U.S. Deputy Clerk

AO 199A (Rev. 6/97) Order Setting Conditions of Release                    Page 1 of __3__ Pages

# UNITED STATES DISTRICT COURT

OCT 17 2018

CLERK...

____Eastern____   **District of**   ____Virginia____

United States of America

v.

Natalie Edwards

Defendant

## ORDER SETTING CONDITIONS
## OF RELEASE

Case Number: 1:18mJ501

IT IS ORDERED that the release of the defendant is subject to the following conditions:

(1) The defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

(2) The defendant shall immediately advise the court, defense counsel and the U.S. Attorney in writing before any change in address and telephone number.

(3) The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as

directed. The defendant shall appear at (if blank, to be notified) ____United States District Court____
For Southern District of New York
~~401 Courthouse Sq., Alexandria, VA~~   on _____   TBD and/or on or before
                                         Date and Time      11/2/18.

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released provided that:

( ✓ ) (4) The defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.
                    and her parents
( ✓ ) (5) The defendant executes an unsecured bond binding the defendant to pay the United States the sum of
One Thousand dollars _____ dollars ($100,000   )
in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

DISTRIBUTION:   COURT   DEFENDANT .   PRETRIAL   SERVICES   U.S. ATTORNEY   U.S. MARSHAL

AO 199B  (Rev 12/11)  Additional Conditions of Release                                                                    Page 2 of 3 Pages

## ADDITIONAL CONDITIONS OF RELEASE

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ☒ ) (6)  The defendant is placed in the custody of:
Person or organization   her parents Archie W. Sours + Martha Sours
Address (only if above is an organization)
City and state                                                        Tel. No.

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _Martha A Sours_                    17 Oct 2018
        _____                   17 Oct 2018
                        Custodian                Date

( ☒ ) (7)  The defendant must:
  ( ☒ ) (a) report on a regular basis to the following agency:   **Pretrial Services**
  ( ☐ ) (b) continue or actively seek employment.
  ( ☐ ) (c) continue or start an education program.
  ( ☒ ) (d) surrender any passport to:  Pretrial Services plus husband's passport
  ( ☒ ) (e) not obtain a passport or other international travel document.
  ( ☒ ) (f) abide by the following restrictions on personal association, residence, or travel:  Do not depart the ~~Washington D.C.~~  SDNY, DC, EDVA
       ~~metropolitan area~~ without prior approval of Pretrial Services or the Court.
  ( ☒ ) (g) avoid all contact, directly or indirectly, with any person who is or ~~may~~ be a victim or witness in the investigation or prosecution, including:  CC 1  Reporter 1, FINCEN personnel (except in presence of counsel)
  ( ☐ ) (h) get medical or psychiatric treatment:

  ( ☐ ) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes:

  ( ☐ ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.
  ( ☐ ) (k) not possess a firearm, destructive device, or other weapon.
  ( ☐ ) (l) not use alcohol ( ☐ ) at all ( ☐ ) excessively.
  ( ☒ ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
  ( ☒ ) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.
  ( ☐ ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.
  ( ☐ ) (p) participate in one of the following location restriction programs and comply with its requirements as directed.
       ( ☐ ) (i)  **Curfew.** You are restricted to your residence every day ( ☐ ) from _____ to _____ , or ( ☐ ) as directed by the pretrial services office or supervising officer; or
       ( ☐ ) (ii)  **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
       ( ☐ ) (iii)  **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.
  ( ☐ ) (q) submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.
       ( ☐ ) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or supervising officer.
  ( ☒ ) (r) report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.
  ( ☒ ) (s) No access to FINCEN property or equipment without express permission of FINCEN director or his designee. Preliminary hearing to be set at least 30 days from now with consent of court in SDNY.

AO 199C (Rev. 09/08) Advice of Penalties                                                                Page_____ of_____ Pages

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_Natali M Cu_
_Defendant's Signature_

NEW KENT    VA                                        804 651 3840
_City and State_                                      _Telephone Number_

### Directions to the United States Marshal

( ☒ ) The defendant is ORDERED released after processing.

( ☐ ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: ___10/17/18___                      _Cllee Cthhana_
                                          _Judicial Officer's Signature_
                                          /s/
                                          **Theresa Carroll Buchanan**
                                          **United States Magistrate Judge**
                                          _Printed name and title_

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL SERVICE   U.S. ATTORNEY   U.S. MARSHAL